# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| DAVID CALDWELL,<br><br>          Plaintiff,<br><br>vs.<br><br>STATE FARM FIRE AND<br>CASUALTY COMPANY, and<br>Does 1-5.<br><br>          Defendants. | CV 20-112-GF-JTJ<br><br><br>**MEMORANDUM<br>AND ORDER** |

## INTRODUCTION

This case arises out of an insurance claim that Plaintiff David Caldwell (Caldwell) submitted to his insurer State Farm Fire and Casualty Company (State Farm) in March 2019 seeking coverage under his Businessowners Coverage Policy. Caldwell sought coverage for losses and expenses that he incurred when a significant amount of snow accumulated on the roof of his physical therapy building in Great Falls, Montana. State Farm denied coverage for most of the losses and expenses claimed by Caldwell.

Caldwell has asserted claims against State Farm for breach of contract, breach of the covenant of good faith and fair dealing, and a violation of the Montana's Unfair Trade Practices Act, Mont. Code Ann. § 33-18-201. State Farm

has asserted a counterclaim. State Farm seeks an order declaring that certain losses and expenses claimed by Caldwell are not covered under the Businessowners Coverage Policy.

Presently before the Court are the parties' motions for summary judgment. Caldwell has moved for partial summary judgment on his breach of contract claim. The parties have filed cross-motions for summary judgment with respect to State Farm's counterclaim for declaratory relief. The Court conducted a hearing on the motions on August 10, 2022. The Court is prepared to rule.

## BACKGROUND

Caldwell and his business partner own C&C Physical Therapy in Great Falls, Montana. State Farm insured the building where C&C Physical Therapy is located (the Building) under a Businessowners Coverage Policy — policy number 96-BF-Q634-7 (the Policy), during the period from March 19, 2018, through March 19, 2019. (Doc. 12 at 7).

A significant amount of snow fell in Great Falls in January and February of 2019. On March 1, 2019, Caldwell informed State Farm that the roof on the Building was sagging due to weight of snow and ice. (Doc. 12 at 3). Caldwell's insurance agent told Caldwell to the have the Great Falls Fire Department inspect the Building. *Id.*

The Great Falls Fire Department and a City of Great Falls Building Inspector (Building Inspector) inspected the Building on March 1, 2019. *Id.* The Building Inspector told Caldwell that he should have the Building inspected by a structural engineer. (Doc. 26 at 2). The Building Inspector ordered the Building closed due to safety concerns caused by the sagging roof structure. *Id.* The Building Inspector also ordered that certain utilities be disconnected due to the sagging roof structure. *Id.*

On March 2, 2019, Caldwell, with the assistance of a construction contractor, placed three 6 inch by 6 inch (6x6) wood posts with telescoping jacks under I-beams that supported the roof to prevent the roof structure from deflecting further inward. (Doc. 12 at 4).

State Farm's claims handler Dwain Tilleman (Tilleman) conducted an initial inspection of the Building on March 4, 2019. (Doc. 12 at 4). Tilleman observed that roof had deflected inward. Tilleman told Caldwell that he would arrange for a structural engineer to inspect the Building. Caldwell responded that he had already made arrangements to have structural engineer, Ben Aakre (Aakre) of Lacy & Ebeling Engineering, Inc. inspect the building on March 5, 2019. (Doc. 12 at 4-5). State Farm approved Caldwell's decision to hire Aakre. *Id.*

Aakre inspected the Building on March 5, 2019. (Doc. 12 at 5). Aakre prepared a report the same day. *Id.* Aakre's inspection and report focused on the structural integrity of the Building's roof structure. (Doc. 32 at 5). Aakre observed no structural failure of the Building. (Docs. 12 at 5; 32 at 9). Aakre explained that the inward deflection of the Building's roof structure of approximately 3.6 inches was normal in light of the snow load on the Building. (Doc. 32 at 9). Aakre noted that the Building was designed to deflect inward up to "4.8 inches by code." *Id.* Aakre recommended that Caldwell reopen the Building, restore the utilities, and remove the snow from the roof. *Id.* During his inspection, Aakre also observed that some of the interior ceiling tiles had visible cracks. Aakre determined that the cracks occurred when the suspended ceiling interacted with the interior partition walls as it moved inward with the sagging roof structure. *Id.*

Aakre's inspection of the Building did not include an inspection of the membrane covering located on top of the roof structure. (Doc. 32 at 4-5). Aakre therefore made no determination whether the membrane covering had sustained damage when the roof structure deflected inward. (Doc. 32 at 4-5, 7-9).

Per Aakre's recommendation, Caldwell made arrangements to have the utilities restored to the Building, and to have the snow removed from the roof. (Doc. 21 at 5). Electrical service was restored to the Building on March 6, 2019.

-4-

(Doc. 26 at 5). Natural gas service was restored on March 7, 2019. *Id.* Water

service was restored on March 8, 2019. *Id.* Snow was removed from the roof on

March 7, 2019. (Doc. 7 at 5). The roof returned to its pre-snow event position.

Caldwell re-opened the Building for business shortly thereafter. (Doc. 26 at 5).

Caldwell informed State Farm of Aakre's findings on or about March 11,

2019. (Doc. 26 at 6). Tilleman conducted a second inspection of the Building on

March 15, 2019. (Doc. 12 at 5). Caldwell showed Tilleman seven ceiling tiles that

had visible cracks, and seven ceiling tiles that had water stains. Caldwell also

presented Tilleman with a copy of Aakre's report. *Id.*

Following Tilleman's second inspection, Caldwell submitted a claim to State

Farm for the following losses and expenses:

1.   The cracked and water stained interior ceiling tiles;
2.   The labor to remove snow from the roof — $818.00;
3.   The labor to brace the roof — $563.00;
4.   The cost to reconnect electricity to the Building— $157.00;
5.   The cost of Aakre's Engineering Inspection — $862.00;
6.   The cost to reconnect natural gas to the Building; and
7.   Caldwell's loss of income while the Building was closed —
     $10,616.25.

(Docs. 12 at 5; 26 at 6).

State Farm responded to Caldwell's claim. State Farm informed Caldwell

that the Businessowners Coverage Policy provided coverage for only a portion of

his claim. State Farm informed Caldwell that the Policy provided coverage for the water damage to the interior ceiling tiles, subject to a $1,000 deductible. (Doc. 26 at 7). State Farm also informed Caldwell that the Policy provided coverage for the cost of Aakre's engineering report. *Id.*

State Farm informed Caldwell that the Policy provided no coverage for the labor to brace the roof, the labor to remove the snow from the roof, the cost of restoring utilities to the Building, or his loss of income, because all of those loses and expenses were incurred as a result of the sagging roof structure and Aakre had determined that roof structure had sustained no physical damage. (Doc. 26 at 7). State Farm further informed Caldwell that the Policy provided no coverage for the seven cracked interior ceiling tiles because the movement of the suspended ceiling that caused the tiles to crack, did not meet the Policy's definition of a collapse. *Id.*

State Farm sent Caldwell a partial denial letter on March 28, 2019. (Doc. 7-1). State Farm explained that Caldwell would not be receiving any payment for the ceiling tiles that had been damaged by water, because State Farm had concluded that the water damage did not exceed the Policy's $1000 deductible. (Doc. 7-1 at 1). Attached to the letter was a copy of State Farm's estimate for the water damage. (Docs. 7-1 at 1; 27-5 at 1-5). The March 28, 2019 letter also described the Policy provisions that State Farm had relied upon in denying coverage for the

cracked interior ceiling tiles, and in denying coverage for the losses and expenses

that Caldwell had incurred due to the sagging roof structure. (Doc. 7-1 at 1-5).

Caldwell demanded that State Farm reconsider its partial denial of coverage

on August 21, 2019, and on February 5, 2020. (Docs. 47-2; 47-3). State Farm

rejected Caldwell's demands.

Caldwell instituted the present action in Montana's Eighth Judicial District

Court, Cascade County on October 20, 2020. (Doc. 6). State Farm removed the

case and filed a Counterclaim for declaratory relief. (Docs. 1; 3).

On March 2, 2021, (approximately two years after the snow event at issue)

Caldwell had the Building's roof membrane inspected by Josh Redd (Redd) of

A. T. Klemens, Inc. in Great Falls. (Doc. 33 at 2). Redd observed that some of the

EPDM roof assembly screws had poked up through the roof membrane leaving the

roof membrane open to moisture. (Doc. 33 at 5). Redd also observed that

flashings that were designed to provide a water seal around an air conditioning duct

on the roof had cracked open and had pulled away from the duct leaving the roof

membrane open to moisture. *Id.* Redd also observed that certain accessory patches

near the air conditioning unit on the roof had become loose leaving the roof

membrane open to moisture. *Id.* Redd opined that these issues with the roof

assembly screws, the flashings, and the accessory patches may have occurred when

the roof deflected inward in March 2019, and then returned to its pre-snow event position when the snow was removed. (Doc. 33 at 5-6).

Redd submitted a written report to Caldwell on March 24, 2021. (Doc. 33 at 5-7). Redd also provided Caldwell with a quote to remove the existing roof membrane and replace it with a new roof covering. (Doc. 33 at 5-7). The amount of the quote was $60,300. (Doc. 33 at 7).

On October 22, 2021, State Farm had the Building's roof membrane inspected by structural engineer William McLaughlin (McLaughlin) of TD&H Engineering in Great Falls. (Doc. 36 at 12). McLaughlin submitted his written report to State Farm on November 24, 2021. (Doc. 36-2). McLaughlin agreed with Redd that a number of "EPDM roofing system fasteners [had] penetrated the roofing membrane and [that] leaks [were] occurring as a result . . .." (Doc. 36-2 at 5). McLaughlin opined that it was "unlikely" that a single snow event in 2019 had caused the EPDM roof fasteners to loosen and penetrate the roof membrane. *Id.* McLaughlin opined that it was more likely that the EPDM roof fasteners slowly loosened over time as the roof structure cycled through multiple deflections of varying magnitudes with every snow event that has occurred over the 24 years that the membrane has been on the roof. *Id.* McLaughlin noted that "useful life of properly installed 40 mil EPDM roofing membrane is typically 25 years." *Id.*

McLaughlin opined that the roof membrane on the Building "ha[d] met or exceeded its useful life and would likely require replacement in the next few years regardless of the deflections . . . that [had] occurred over the past 24 years." *Id.*

Upon receipt of the reports prepared by Redd and McLaughlin regarding the status of the Building's roof membrane, Caldwell expanded his coverage claim to include the cost of installing a new roof covering on the Building. (*See* Doc. 25 at 12, n. 1).

## APPLICABLE LAW

### a.    Summary Judgment Standard

Summary Judgment is proper "if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

### b.    Application of Montana Law

Diversity of citizenship provides the Court's jurisdiction in this case. 28 U.S.C. 1332. The Court must therefore apply Montana's substantive law. *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002). Under Montana law, the language of the insurance policy governs if it is clear and explicit. *Steadele v. Colony Ins. Co.*,

260 P.3d 145, 149 (Mont. 2011); *Truck Ins. Exchange v. Waller*, 828 P.2d 1384, 1386 (Mont. 1992).

**DISCUSSION**

Caldwell's claim for insurance coverage has four distinct parts. First, Caldwell seeks coverage for the labor to remove snow from the Building's roof on March 7, 2019, the labor to temporarily brace the roof in March 2019, and the cost of reconnecting utilities to the Building in March 2019. Second, Caldwell seeks coverage for the seven interior ceiling tiles that were cracked on or about March 1, 2019. Third, Caldwell seeks coverage for the loss of income he incurred while the Building was closed in March 2019. Fourth, Caldwell seeks coverage for damages to the membrane covering on top of the roof that allegedly occurred on or about March 1, 2019.

### A.    Labor for Snow Removal, Labor to Brace the Roof, and the Cost of Reconnecting Utilities to the Building

The labor to remove snow from the roof, the labor to provide temporary bracing under the roof structure, and the cost of reconnecting the utilities to the Building, all were expenses that Caldwell incurred because the roof structure temporarily deflected inward based on the heavy snow load in March 2019. These expenses were incurred because a City of Great Falls Building Inspector, the Great

Falls Fire Department and Caldwell all had assumed that the Building's roof structure had failed making the Building unsafe to occupy.

The Policy affords coverage for an accidental direct physical loss to a covered property caused by a covered cause of loss, subject to certain exclusions and limitations.  (Doc. 27-10 at 4-5).  The Policy also affords coverage for an accidental direct physical loss to a covered building caused by a collapse of the building or a part of the building.  (Doc. 27-10 at 10-11).  The term "collapse" is defined in the Policy as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose."  (Doc. 27-10 at 10).  The Policy further provides that "[a] building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." *Id.*

Here, no coverage exists for the labor to remove snow from the roof, or for the labor to provide temporary bracing under the roof, or for the cost of reconnecting the utilities to the Building, because the Building did not collapse and the roof structure did not suffer any physical injury.  Montana law defines "physical injury" to property as "a physical and material alteration resulting in a detriment." *Swank Enterprises v. All Purpose Services, Ltd.*, 154 P.3d 52, 56

-11-

(Mont. 2007).  Aakre, the structural engineer who was selected and hired by

Caldwell to inspect the sagging roof, determined that the Building's roof structure

did not collapse or suffer any physical injury.  Aakre explained in his report that

the Building's roof structure was designed to deflect inward when the roof

experienced a heavy snow load.  It is undisputed that the Building's roof structure

deflected inward as designed and then returned to its original pre-snow event

position when the heavy snow load was removed from the roof.

**B.     The Cracked Interior Ceiling Tiles**

As discussed above, Caldwell submitted a coverage claim for seven interior

ceiling tiles that had cracked during the snow event on or about March 1, 2019.

This loss to the interior ceiling tiles is governed by the Policy's "Property

Subject to Limitations" provision.  (Doc. 27-10 at 5).  The Property Subject to

Limitations provision provides, in pertinent part, that no coverage exists for a loss

to "[t]he interior of any building . . . caused by snow, sleet or ice unless:

> (1)  the building . . . first sustains damage by a Covered Cause
>      of Loss to its roof, outside walls, or outside building glass
>      through which the rain, snow, sleet [or] ice . . . enters; or
>
> (2)  the loss is caused by thawing of snow, sleet or ice on the
>      building. . ..

(Doc. 27-10 at 5).

Here, no coverage exists for the seven cracked interior ceiling tiles because the tiles did not crack due to snow, sleet or ice entering the building, and the tiles did not crack due to the thawing of snow, sleet or ice on the Building. Aakre determined that the ceiling tiles cracked due to an interaction between the suspended ceiling and the interior partition walls as the suspended ceiling moved inward with the sagging roof structure. (Doc. 32 at 9). The record contains no evidence to the contrary.

### C.    Caldwell's Loss of Income

As discussed above, Caldwell submitted a claim for the income he allegedly lost during the period in March 2019 when the Building was shut down due to the sagging roof structure.

The Policy contains two endorsements that provide coverage for loss of income: Endorsement CMP-4703 and Endorsement CMP-4705. Caldwell has conceded that Endorsement CMP-4703 does not apply in this case. (Doc. 49 at 1). The parties disagree on whether Endorsement CMP-4705 is applicable.

Endorsement CMP-4705 provides, in pertinent part, as follows:

### 1.    Loss of Income

      a.    We will pay for the actual "Loss of Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by accidental

> direct physical loss to property at the described premises."

(Doc. 27-11 at 1). Endorsement CMP-4705 clearly provides that an insured may recover a loss of income only if he can show that the suspension of his operations was caused by an accidental direct physical loss to the covered property. *Id.*

Here, no coverage exists under Endorsement CMP-4705 because Caldwell's claimed loss of income was not caused by an accidental direct physical loss to his physical therapy Building. Caldwell's loss of income occurred because a City of Great Falls Building Inspector had ordered the Building closed based on a mistaken belief that the Building roof structure had failed. It was later determined that the Building's roof structure had sustained no physical injury as a result of the snow event in March 2019.

## D.    Damage to the Membrane on Top of the Roof

With respect to the damage to the roof membrane, both Redd and McLaughlin agree that a number of the Building's EPDM roofing system fasteners have penetrated the membrane and that water leaks have been occurring as a result. (*See* Redd's report — Doc. 33 at 5; McLaughlin's report — Doc. 36-2 at 5). It is unclear, however, whether the damage to the roof membrane observed by Redd and McLaughlin, qualifies as direct physical loss covered by the Policy. State Farm failed to inspect the condition of the roof membrane in March 2019,

even though Caldwell and Tilleman had observed water damage on seven interior ceiling tiles at that time.

The record contains conflicting evidence on whether the snow event in March 2019 was the sole cause of the damage to the roof membrane. Redd has opined that the roofing system fasteners penetrated the roof membrane during the snow event in March 2019, when the roof structure deflected inward and then returned to its pre-snow event position. (Doc. 33 at 2, 5-6). Redd's opinion is supported by Caldwell's Declaration. Caldwell stated, in his Declaration, that he had observed no water leaking into the Building in the 24 years prior to March 1, 2019. (Doc. 31 at 7).

On the other hand, McLaughlin has opined that it is "unlikely" that a single snow event in 2019 would cause the EPDM roof fasteners to penetrate the roof membrane. (Doc. 36-2 at 5). McLaughlin has opined that it is more likely that the EPDM roof fasteners slowly penetrated the roof membrane over time as the Building's roof structure cycled through multiple deflections of varying magnitudes with every snow fall event that occurred over the 24 years that the membrane has been on the roof. *Id.* Issues of material fact therefore exist as to whether the damage to the roof membrane is covered by the Policy.

Accordingly, IT IS HEREBY ORDERED:

1.      State Farm's Motion for Summary Judgment (Doc. 24) is GRANTED

in part, and DENIED in part, as follows:

      a.      State Farm's Motion for Summary Judgment is GRANTED
         with respect to Caldwell's claim for the following losses and
         expenses: the labor to remove snow from the Building's roof;
         the labor to brace the Building's roof, the cost to reconnect the
         utilities to Building, and Caldwell's loss of income while the
         Building was closed in March 2019.

      b.      State Farm's Motion for Summary Judgment is GRANTED
         with respect to Caldwell's claim for the seven cracked interior
         ceiling tiles.

      c.      State Farm's Motion for Summary Judgment is DENIED with
         respect to Caldwell's claim for damages to the membrane on
         the Building's roof.

2.      Caldwell's Motion for Partial Summary Judgment (Doc. 28) is

DENIED.

DATED this 31st day of October, 2022.

John Johnston
United States Magistrate Judge